GREEN ET AL., APPELLANTS, v. THE HUNTINGTON NATIONAL BANK,
APPELLEE.

[Cite as Green v. Huntington Natl. Bank, 3 Ohio App. 2d 62.]

(No. 7209—Decided August 11, 1964.)

*Mr. Robert E. Albright, Mr. James C. Justice* and *Mr. Phillip K. Folk,* for appellants.
*Messrs. Wright, Harlor, Morris, Arnold & Glander,* for appellee.

DUFFEY, J. This is an appeal on questions of law and fact from a judgment of the Common Pleas Court of Franklin County in favor of the defendant, appellee herein, and an order dismissing the petition of the plaintiffs, appellants herein. The case is before this court for a *de novo* determination of the facts based on the evidence presented in the trial court. The plaintiffs-appellants will be referred to as the plaintiffs and the defendant-appellee as the bank.

The action is in equity to enjoin the bank from engaging

in the unauthorized practice of law in connection with the advertising and providing of services in a program of "estate analysis." Plaintiffs are the duly authorized representatives of the Ohio State Bar Association and are members of that Association's Unauthorized Practice of Law Committee. The defendant banking corporation is organized as a national bank under the law of the United States. It is authorized by federal and state law to act in trust and other fiduciary capacities. It has a Trust Department. The controlling question is whether the bank through its Trust Department is providing legal advice to persons who avail themselves of the bank's program. If so, then the advertising of such services in their present form is equally illegal.

In our opinion, the bank is engaged in the unauthorized practice of law and should be enjoined.

To place this case in perspective, several preliminary observations seem important. Many business and professional activities are controlled by the state for the common good. The licensing system is one of the regulatory methods. Among the many occupations or service activities so controlled are attorneys, medical doctors, architects, engineers, brokers, etc. Banks and other financial institutions are controlled in a similar manner. In all these instances, one of the prime purposes is to assure the public of minimal competency and responsibility. The stringency of the standards for qualification varies, but the fundamental basis for all such regulatory control rests upon a prohibition or denial of the right of anyone to engage in that occupation or activity unless the qualifications prescribed by law have been formally met and the authority granted.

It is apparent that an unlicensed person may by study become an expert in any particular matter. He can acquire a competency in that regard which is greatly in excess of the average licensed person. In some areas of our society today, business or governmental operations require, or at least incline, individuals to become deeply acquainted with various aspects of licensed occupations. There is a natural tendency to use this knowledge. However, when its use is not confined to their own business and interests, but instead is provided to others, it

becomes an unlicensed, unauthorized and illegal activity. Whether or not the actual service rendered is of excellent quality, the fact of providing it is a threat to the regulatory system and destructive of the common good. Where such a person cannot or will not obtain legal authority to so act, the quality of his service becomes irrelevant.

The fact that law touches upon all of our society makes it a field in which many persons and institutions can and even must become highly knowledgeable on some of its aspects. Difficult areas today are trust departments, actuaries, pension plan consultants, insurance underwriters and architects. The problem in such areas is aggravated by the fact that they have also become legal specialities for attorneys. The tendency of the nonattorney to make unauthorized use of knowledge so acquired is accentuated by the fact that the average attorney does not practice in these fields, and many will have less knowledge of their special aspects than does the nonattorney. The lack of any method by which the nonattorney and the public at large may readily determine an attorney's competency in such fields is an additional aspect. See Kent's Problems of Specialization, Volume XXXVII of the Ohio Bar, May 25, 1964, page 541.

As the bank implicitly suggests in its brief, perhaps some aspects of these fields have become so distinct that they deserve their own category and their own licensing outside traditional concepts of the practice of law. However, such an approach involves fundamental questions of public policy that this court is not entitled to pass upon either directly or in the guise of redefining the concept of the practice of law. Until the Legislature or the Supreme Court states otherwise, it is our opinion that the providing of specific legal information in relation to specific facts is the rendering of legal advice and constitutes the practice of law. See *State Bar Association of Connecticut* v. *Connecticut Bank & Trust Co.* (1959), 146 Conn. 556, 153 A. 2d 453, and *Judd* v. *City Trust & Savings Bank* (1937), 133 Ohio St. 81, paragraph five of the syllabus.

Many persons give legal advice on many occasions where the context calls for the application of ''de minimus non curat lex,'' i. e., it is too insubstantial a matter to be of concern. See

*Oregon State Bar* v. *Miller* (1963), 235 Or. 341, 385 P. 2d 181. Where, as here, it is carried on as a regular program of a major institution and sought after by advertising in public media, we cannot ignore the illegality of the conduct nor the disruptive influence that it has.

We do not consider the payment of a fee as an essential element of the practice of law. The significance of a fee is evidentiary only, *i. e.*, as evidence of the fact of giving legal advice or as a factor in determining whether the activity is sufficient to warrant legal repression.

Where a person has substantial assets, there is an interplay between the character of his assets, changes in the form of his investments, and the manner of controlling his investments. This interplay affects the fields of tax law, the law of wills and decedent's estate, the law of trusts and future interests, the law of real and personal property, and many other such fields. Understanding and effectively applying these diverse matters and subjects to achieve a controlled and beneficial result in any particular estate is a very complex matter. It has surely evolved into one of the most expert skills in our society. The present case is concerned with the bank's activities in this highly specialized area. The case is concerned only with those activities as they have been carried on by the bank since June 10, 1960. It is the bank's contention that its "estate analysis" program provides only general information and general comments or suggestions on various problems in the handling of an estate. It is contended that after educating the prospect to the need for estate planning the prospect is referred to an attorney. This case does not involve any activity in the form of drafting instruments or appearances in court.

Of course, it is apparent that general education or information on the subject of estate planning is not the practice of law. Many commercial businesses provide that service, most notably publication companies such as Commerce Clearing House and Prentice-Hall. Such publications do not purport to provide a solution for any particular person's needs nor a solution to any particular problem based on the specific facts of a particular person's assets or holdings.

In the present case, the bank's program consisted of advertising designed to solicit inquiry. The principal lure is the indication of substantial savings in taxes at death. The prospect is asked to provide complete information on his assets, investments, insurance, potential inheritance, gifts of money or property that have been made, his will, the status of his marriage, children, the assets of his family, etc. Information is also acquired, at least generally, as to the prospect's ideas or desires on the testamentary disposition of his holdings, *i. e.*, to whom, how much, etc.

The information so acquired by the Trust Department is then fitted by its officials into an "estate analysis" form. This consists of five parts: (1) Foreword. (2) Summary of Estate Data. (3) Prospect's "Present Situation." (4) Comments or Suggestions. (5) Conclusion. Throughout the analysis, there are numerous statements suggesting that the prospect consult his attorney. The foreword states that the analysis is in "broad, general form" and that the prospect "will need the advice and services of your attorney." We are concerned, of course, with the substance of what is done and not with the prefatory statements.

The testimony of the bank's chief trust officer indicates the basic approach to making up such an analysis. He testified that the Trust Department has developed a considerable number of "boiler plate" provisions. Upon going over the prospect's data, the department includes a few standard paragraphs and then selects others most appropriate or similar to the customer's situation. After pruning the "boiler plate" provisions, additional comments or suggestions are added. Some additions appear to be merely the personalizing of a standard provision by adding pronouns, proper names, etc. Other changes are more specific. Counsel suggests that this predrafting method is analogous to commercial publications. Obviously, however, it can be carried to the point where the predrafts are so numerous, and the pruning and selection so specific, that the analogy breaks down. An examination of the exhibits in evidence shows just that.

Most analyses contain references to the marital deduction

trust. Some suggest a residual trust. Others do not. Insurance trust appears frequently, but some go on to suggest a final disposition of property under the will of the prospect's wife. Where there are children, a common suggestion is to continue the proposed trust beyond the wife's death for the benefit of the children. Such careful pruning to fit the prospect's particular circumstances becomes dubious when it reflects only the data peculiar to his estate. Such a process is not the same thing as illustrating a problem by using actual estates already administered, or hypothetical facts roughly similar to the prospect's estate.

However, the bank's analyses contain other provisions which are considerably more specific. Seven of the exhibits suggest "possible desirable" modifications in the manner of handling joint holdings of deposits or securities. Five suggest the need to examine possible gift tax liability arising from the manner in which a prospect happened to have set up the title to real estate or personal property within his family or business at the time the property was acquired. Here, the pruning or selecting of provisions is either nonexistent or so highly refined that it has become an analysis of that prospect's estate in the light of legal considerations.

Other examples of this process in the bank's program include:

(A) Suggested wills by both husband and wife, his to include trusts, and hers to take her estate directly to him because the data showed her estate to be small.

(B) Suggested use of an *inter vivos* trust and, in one instance, a suggested trust for the benefit of the prospect's father, mother and sister, with an ultimate gift to charity.

(C) Where data showed shares in closely held corporations or partnerships, a comment on the danger of "excessive" valuation at death, with suggestions to reorganize the capital structure of the corporation or convert a partnership into a corporation. Attention was also directed to stock purchase contracts and insurance as a hedge.

(D) A suggestion in one instance that the prospect's mother "consult her attorney" about a trust for the prospect

and his brother, ultimately to pass to the grandchildren, and thereby to avoid the inheritance being taxed at the death of the prospect and his brother. Similarly, an analysis with a suggestion that a sister use a trust for the mother and father, ultimately to pass to the prospect.

(E) A suggestion in one instance of inter vivos gifts to children.

The examples recited are not provided to criticize the validity or invalidity of the suggestions made. Many are almost elementary to anyone acquainted with estate planning. Rather, the point is to show that they are directed at the particular circumstances of that specific prospect. In that regard, it is instructive to compare two post-1960 analyses of the bank with a pre-1960 "estate plan" prepared by the bank. Exhibits 12 and 14 are post-1960 "estate analysis" plans.

Exhibit 12:

"6. You and your business associate and your wives each have an interest in a parcel of real estate located in Indiana. At the death of any of the four of you there could be complications in transferring the decedent's interest since an ancillary administration in Indiana would be required. Furthermore, with two unrelated families owning undivided interests in real estate there is always the possibility of a partition proceeding.

"You might well, therefore, consider placing this real estate in a revocable trust * * *.

"7. You might also consider transferring your one-half interest in the other Indiana real estate to your insurance trust during your lifetime, so as to eliminate the expense and complications of an ancillary administration, on this property."

Exhibit 14:

"8. You and the other co-owners of the vacant land might consider the use of a trustee to hold legal title to these properties. At the present time, in the event of any of your deaths, the undivided interest of the decedent would be further sub-divided among his heirs. In time this might cause friction to develop in the management of the properties. By using a trustee to hold a single title to the properties, management of them could be consolidated regardless of the number of fractional interests

in the trust, and each owner of an undivided interest would receive his or her share of the net income.''

Exhibit 43 is a pre-1960 plan. One of its provisions states: ''* * * However, we think you should have a written partnership agreement which definitely provides for a continuation of the partnership, by the survivors, after the death of any of the partners.

''We suggest that you remove from your estate the increasing cash values of the policies which you hold on your children's lives and on the life of your grandson, by making a transfer now to each of your children of their respective policies, and transfer to your son the policy on your grandson's life. Also, since your son and daughter are married now the beneficiaries named in the policies on their lives should probably be changed.''

In our opinion, the difference in these provisions is one of style, but not one of content.

The bank's present program appears to have been deliberately designed to emulate the man on the edge of the cliff with one foot poised over the brink. The exhibits show that in its actual operation the wind blew too hard and the bank has fallen into the practice of law.

We wish to emphasize that we do not question the sincerity or the ability of the bank's officers in the rendering of this service. Nor are we disparaging the solicitation of business by a bank. This case does not, in our view, call for elucidation of anything new or the extension of anything old in the concept of the practice of law. It is a case which involved the tedious job of reviewing the evidence to determine whether the bank has, in this particular program, overstepped the present boundaries between business activities and the practice of law.

The terms of an injunction present many practical drafting problems. The bank must be enjoined from advertising and providing its present estate analysis services. However, it is not the name but the conduct which is illegal. The bank may, and probably will, wish to revise the program to bring it within this opinion. The gathering of factual information from the prospect may create the ability to give legal advice but in itself is not the practice of law. We see no objection to the use of

illustrative examples of estate problems even though deliberately picked for similarity to the prospect's situation where that process is used with reasonable circumspection. We see no objection from the viewpoint of the practice of law to the advertising that the bank has carried on if the program itself is revised.

We suggest that the parties attempt to arrive at an agreed entry. Application may, of course, be made to the court at any time for a conference on the terms of an injunction.

The judgment of the Common Pleas Court will be, and hereby is, reversed and vacated. The cause will be retained for preparation of an injunction entry.

*Judgment reversed.*

TROOP, J., concurs.
BRYANT, J. (Presiding), dissents.